JS 44 (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
ALPS Property & Casualty Insurance Company

**DEFENDANTS**
Daniel W. McKay; Daniel W. McKay & Associates, PLLC; Keystone Land Development LLC; and Tim Aalders

**(b)** County of Residence of First Listed Plaintiff   (Montana)
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Utah
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Gregory J. Sanders, Kipp and Christian, P.C.
10 Exchange Place, 4th Floor
Salt Lake City, Utah 84111  801-521-3773

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. 1332(a)(1)
Brief description of cause:
Dec action re: insurance coverage and claim for defense costs expended on underlying state action

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____   DOCKET NUMBER _____

DATE   08/27/2018
SIGNATURE OF ATTORNEY OF RECORD   Gregory J. Sanders

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____

Case: 2:18-cv-00670
Assigned To : Pead, Dustin B.
Assign. Date : 8/28/2018
Description: ALPS Property & Casualty Insurance v. McKay et al

Gregory J. Sanders, USB No. 2858
Kipp & Christian, P.C.
10 Exchange Place, Fourth Floor
Salt Lake City, Utah 84111
Telephone: (801) 521-3773
gjsanders@kippandchristian.com
*Counsel for Plaintiff ALPS Property & Casualty Insurance Company*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ALPS PROPERTY & CASUALTY INSURANCE COMPANY,<br><br>    Plaintiff,<br><br>v.<br><br>DANIEL W. MCKAY;<br>DANIEL W. MCKAY & ASSOCIATES,<br>PLLC; KEYSTONE LAND DEVELOPMENT<br>LLC; and TIM AALDERS,<br><br>    Defendants. | Case No. 2:18-cv-00670 DBP<br><br><br>COMPLAINT |

Plaintiff ALPS Property & Casualty Insurance Company ("ALPS"), pursuant to 28 U.S.C. §§ 2201(a) and 2202 and Federal Rules of Civil Procedure 8(a) and 57, for its complaint against Defendants Daniel W. McKay ("McKay"), Daniel W. McKay & Associates, PLLC ("McKay Firm" together with McKay, "McKay Defendants"), Keystone Land Development LLC ("Keystone"), and Tim Aalders ("Aalders", collectively "Defendants") alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1.     ALPS is an insurance company and corporation organized under the laws of the State of Montana with its principal place of business in the State of Montana.

2.      McKay is an attorney licensed and practicing in the State of Utah and, upon information and belief, a resident of the State of Utah.

3.      The McKay Firm is a professional limited liability company organized under the laws of the State of Utah with its principal place of business located in Spanish Fork, Utah.

4.      Keystone is a limited liability company organized under the laws of the State of Utah and, upon information and belief, has its principal place of business in Utah County, Utah.

5.      Aalders is the managing member of Keystone and, upon information and belief, is a resident of the State of Utah.

6.      The Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity exists between ALPS and Defendants, and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims for relief occurred in this district.

## GENERAL ALLEGATIONS

### I. Introduction

8.      In this action, ALPS seeks declaratory relief with respect to whether there is coverage afforded for the claim ("Claim") by Aalders and Keystone (collectively "Claimants") against the McKay Defendants, ALPS's insureds, as articulated in the suit styled *Keystone Land Dev., LLC, et al. v. Matthew M. Robinson, et al.*, No. 160100255 (4th Jud. Dist. Utah Cty., Utah) ("Suit").[1]  A true and correct copy of Claimants' February 9, 2018 operative complaint, the third

---

[1] The Suit is a third party action brought against the McKay Defendants and others and originally styled *Rafati Holdings, LLC v. Keystone Land Dev., LLC*, No. 160100255 (4th Jud. Dist. Utah Cty., Utah) ("*Rafati* Suit").

4826-8619-5561.6

amended third party complaint ("Third Amended Third Party Complaint"), filed in the Suit is attached as Exhibit A.

9.     The Claim arises from a complex background concerning multiple parties and entities involved in the acquisition and development in 2014-2015 of two parcels of land, Highland Estates in Highland, Utah ("Highland Property") and Pleasant Heights in Pleasant Grove, Utah ("Pleasant Heights Property").

10.     These developments generated a web of litigation, and three core suits were eventually filed in the District Court of Utah, Fourth Judicial District, Utah County, American Fork Department: the *Rafati* Suit, No. 160100255; *Holt Dev. Group, LLC v. Keystone Land Dev., LLC*, No. 170400043 ("*Holt* Suit"); and *Tim Aalders v. Holt Dev. Group, LLC*, No. 170400203 ("*Aalders* Suit").

11.     The *Rafati* Suit was filed on November 29, 2016 against Keystone, and on June 29, 2017, Claimants, as third party complainants in the *Rafati* Suit, filed their amended third party complaint.

12.     In two further iterations of the *Rafati* Suit, Claimants filed the second amended third party complaint ("Second Amended Third Party Complaint") on September 7, 2017 and the Third Amended Third Party Complaint, both naming the McKay Defendants as third party defendants.  A true and correct copy of the Second Amended Third Party Complaint is attached as Exhibit B.[2]

---

[2] On July 11, 2017, Claimants resolved all claims between the original parties to the *Rafati* Suit, Rafati Holdings, LLC ("Rafati Holdings") and third-party plaintiffs, but the Suit remains. (*See* Am. Mot. to Dismiss for Failure to State a Claim, or in the Alternative, Mot. for Partial Summ. J., and Req. for Att'y Fees Re: Third Party Pls.' Verified Third Am. Compl. ("Am. Mot. to Dismiss") ¶ 31 and at 10.  A true and correct copy of the McKay Defendants' Am. Mot. to Dismiss is attached as Exhibit C.).

13.     The Second Amended Third Party Complaint alleged the following causes of action against the McKay Defendants and others: Breach of Contract; Accounting and Winding Up; Fraudulent Transfer; Constructive Trust/Receiver; Injunction; Fraud; Interference with Economic Relations; Conspiracy; Breach of Fiduciary Duty; Intentional Infliction of Emotional Distress; and Unjust Enrichment. (Exhibit B).

14.     In the Second Amended Third Party Complaint, Claimants alleged (a) the McKay Defendants purchased participation rights with respect to the Pleasant Heights Property, which gave the McKay Defendants options to purchase lots in the development, (b) meanwhile, the McKay Defendants represented numerous persons and entities in the *Rafati* Suit, and came to represent numerous other persons and entities in the related *Holt* and *Alders* Suits, discussed *infra*, (c) such representation generated an unresolved conflict of interest among various entities, and (d) the McKay Defendants acted, despite these conflicts, "with an eye towards becoming the legal owner of the Pleasant Heights [Property]." (Exhibit B ¶¶ 63-67, 107-114, 171-181, 191-193, 196(e), 216(e)).

15.     The Third Amended Third Party Complaint alleges the following causes of action against the McKay Defendants and others: Fraudulent Transfer; Constructive Trust/Receiver; Interference with Economic Relations; Conspiracy; Breach of Fiduciary Duty; and Intentional Infliction of Emotional Distress. (Exhibit A).

16.     In the Third Amended Third Party Complaint, Claimants further allege (a) the McKay Defendants violated Utah Rules of Professional Conduct 1.7 and 1.8 by failing to disclose and remediate conflicts of interest, and (b) the McKay Defendants, individually and collectively, are the alter egos of each other and Big D Holdings, LLC ("Big D"), as well as

4826-8619-5561.6

some or all of their clients involved in the various transactions and litigation that led to the *Rafati* Suit. (Exhibit A ¶¶ 184-197).

17.     On March 13, 2018, the McKay Defendants filed an amended motion to dismiss the Third Amended Third Party Complaint, which was stricken by the court on April 18, 2018 due to its length. (Exhibit C; Order on Am. Mot. to Dismiss, April 18, 2018, at 2. A true and correct copy of the Order on Am. Mot. to Dismiss is attached as Exhibit D.).

18.     The McKay Defendants first notified and submitted the Claim to ALPS by correspondence dated April 23, 2018, five days after the court in the Suit struck the McKay Defendants' Am. Mot. To Dismiss.

19.     ALPS issued Lawyers Professional Liability Insurance Policy No. ALPS17741-3 to the McKay Firm for the policy period April 1, 2017 to April 1, 2018 ("2017 Policy"), which provides coverage for a "claim first made against the Insured and first reported to the company during the policy period[.]". (2017 Policy, Insuring Agreements § 1.1. A true and correct copy of the 2017 Policy is attached as Exhibit E.).[3]

20.     McKay is listed as an insured attorney under the 2017 Policy. (Exhibit E, Declarations Item 2).

21.     The 2017 Policy's insuring agreement states, in relevant part:

Subject to the Limit of Liability, exclusions, conditions and other terms of this Policy, the Company agrees to pay on behalf of the Insured all sums (in excess of the Deductible amount) that the Insured becomes legally obligated to pay as Damages, arising from or in connection with A CLAIM FIRST MADE AGAINST THE INSURED AND FIRST REPORTED TO THE COMPANY DURING THE POLICY PERIOD, provided that:

---

[3] The McKay Defendants have not sought coverage for the Suit under the 2017 Policy. For reasons described *infra*, ALPS nevertheless seeks a judgment declaring the 2017 Policy does not afford coverage to the McKay Defendants for the Suit.

1.1.1    the Claim arises from an act, error, omission or Personal Injury that happened on or after the Loss Inclusion Date and the Retroactive Coverage Date set forth in Items 2 and 3 of the Declarations, and that the Claim arises from or is in connection with:

(a)    an act, error or omission in Professional Services that were or should have been rendered by the Insured[.]

(Exhibit E, Insuring Agreements §§ 1.1-1.1.1(a)).

22.    "Claim" is defined in the 2017 Policy as "a demand for money or services, including but not limited to the service of suit or institution of arbitration proceedings against the Insured." (Exhibit E, Definitions § 2.3). "Professional Services" are defined, in part, in the 2017 Policy as "services or activities performed for others as an Attorney in an attorney-client relationship on behalf of one or more clients applying the Attorney's specialized education, knowledge, skill, labor, experience and/or training[.]" (Exhibit E, Definitions § 2.24.1).

23.    ALPS contends the 2017 Policy does not afford coverage to the McKay Defendants for the Claim—including, but not limited to, the Suit—because: (a) the Claim was not reported within the 2017 Policy's policy period; (b) the Suit alleges damages not covered under the 2017 Policy's definition of "damages"; (c) the Claim arises from and the Suit alleges "professional services" by McKay for entities other than the McKay Firm; (d) the Claim arises from and the Suit alleges fraudulent, dishonest, and intentionally wrongful conduct; and (e) the Claim arises from and the Suit alleges "professional services" rendered by the McKay Defendants in connection with their control over an organization other than the McKay Firm.

24.    ALPS issued Lawyers Professional Liability Policy No. ALPS17741-4 to the McKay Firm for the policy period April 1, 2018 to April 1, 2019 ("2018 Policy" and together with the 2017 Policy, "Policies"), which provides coverage for "a claim first made against the

Insured and first reported to the company during the policy period[.]" (2018 Policy, Insuring Agreements § 1.A. A true and correct copy of the 2018 Policy is attached as Exhibit F.).

25. McKay is listed as an insured attorney under the 2018 Policy. (Exhibit F, Declarations Item 3).

26. The McKay Firm's application for the 2018 Policy ("2018 Application") was executed on February 13, 2018 and answered "No" to the question: "Has any claim or suit been made against you or any other current or former member of this Firm or any Predecessor Firm in the last five years?"

27. On the Individual Attorney Supplement to the 2018 Application McKay completed on March 7, 2018, McKay answered "No" to the following questions: (a) "Has any professional liability claim or suit been made against you within the last 5 years, regardless of whether indemnity was paid?" and (b) "Are you aware of or do you have knowledge of any fact, circumstance, act, error, or omission that could reasonably be expected to be the basis of a claim against you, regardless of the merit of such claim?"

28. The acceptance page forms to the 2018 Application were executed by McKay on March 26, 2018 and represented "there exists no changes to the answers and information set forth in the [2018] Application the [McKay Firm] has submitted to ALPS, including all supplements and attachments thereto."

29. ALPS issued the 2018 Policy to the McKay Firm in reliance on those representations.

30. The 2018 Policy provides:

This is a '*CLAIMS MADE AND REPORTED*' insurance Policy. Therefore, as a condition precedent to the Company's obligation to defend or indemnify the Insured under this Policy, the Insured must immediately report any Claim to the Company during the Policy Period or during any applicable Extended Reporting

Period.  No coverage exists under this Policy for a Claim which is first made against the Insured or first reported to the Company before or after the Policy Period or any applicable Extended Reporting Period.

(Exhibit F at 1) (emphasis in original).  "Claim" is defined in the 2018 Policy as "a demand for money or services including, but not necessarily limited to, the service of suit or institution of arbitration or alternative dispute resolution proceedings against the Insured."   (Exhibit F, Definitions § 2.C).

31.    The 2018 Policy affords coverage, subject to other terms, if "[a]t the Effective Date of this Policy, no Insured knew or reasonably should have known or foreseen that the Wrongful Act might be the basis of a Claim", "[n]otice of the Claim or the Wrongful Act was not given nor required to be given to any other insurer prior to the Effective Date", and "[t]he Claim is not otherwise covered under any other insurance policy that the Company has issued to the Named Insured."  (Exhibit F, Insuring Agreements §§ 1.A.2-1.A.4).  "Wrongful Act" is defined, in part, in the 2018 Policy as an actual or alleged "[a]ct, error or omission in Professional Services that were or should have been rendered by the Insured[.]"  (Exhibit F, Definitions § 2.BB.1).  "Professional Services" is defined, in part, in the 2018 Policy as "services or activities performed for and on behalf of the Named Insured or a Predecessor Law Firm and rendered solely to others as . . . [a]n Attorney in an attorney-client relationship on behalf of one or more clients applying the Attorney's specialized education, knowledge, skill, labor, experience and/or training, including pro bono services[.]"   (Exhibit F, Definitions § 2.Y.1).

32.    ALPS contends the 2018 Policy does not afford coverage to the McKay Defendants for the Claim—including, but not limited to, the Suit—because: (a) the Claim against the McKay Defendants was first made prior to the 2018 Policy's April 1, 2018 effective

date; (b) at the effective date of the 2018 Policy, the McKay Defendants knew of the Claim made against them; (c) the Suit alleges damages not covered under the 2018 Policy's definition of "damages"; (d) the Claim arises from and the Suit alleges "professional services" by McKay for entities other than the McKay Firm; (e) the Claim arises from and the Suit alleges fraudulent, dishonest, and intentionally wrongful conduct; and (f) the Claim arises from and the Suit alleges "professional services" by the McKay Defendants in connection with their control over an organization other than the McKay Firm.

33.    ALPS seeks a judgment in its favor declaring the Policies do not afford coverage to the McKay Defendants for the Claim, including, but not limited to, the Suit.

## II. Background

### A. Underlying Real Estate Transactions

34.    On June 11, 2014, Aalders, manager of Keystone, submitted an offer to purchase land on behalf of Keystone in Highland, Utah and entered into a Real Estate Purchase Contract ("Highland REPC") to purchase the Highland Property for $2.6 million.  (Declaration of Tim Aalders, Dec. 30, 2016, filed on Jan. 13, 2017 in the *Rafati* Suit ("Aalders Decl.")  ¶¶ 9-15; Highland REPC at 1; Ruling and Order on Motion to Nullify Wrongful Lien in *Rafati* Suit, at 1 (Feb. 17, 2017) ("*Rafati* Nullification Order").  True and correct copies of the Aalders Decl., the Highland REPC, and the *Rafati* Nullification Order are attached respectively as Exhibit G, Exhibit H, and Exhibit I.).

35.    On July 16, 2014, Keystone recorded a Notice of Interest in the Utah County Recorder's Office with respect to its offer to purchase the Highland Property and the Highland REPC.  (Exhibit I at 2).

4826-8619-5561.6

36.    In August 2014, Brent Robinson and Matthew Robinson (together, "Robinsons") formed Blackstone Group LLC ("Blackstone Group") and Holt Development Group, LLC ("Holt").[4]  (Exhibit I at 2).

37.    In August 2015, Holt formed Blackstone Townhomes Group, LLC ("Blackstone Townhomes"), which was unknown to and did not include Aalders and Keystone. (Exhibit I at 2).

38.    In August 2015, Holt obtained an assignment of interest in the Highland REPC from Keystone/Aalders to Blackstone Townhomes, instead of Blackstone Group, in an ultimately disputed transaction regarding rights in the Highland Property.  (Exhibit I at 2).

39.    In January 2015, Keystone submitted an offer to purchase the Pleasant Heights Property and subsequently entered into a Real Estate Purchase Contract ("Pleasant Heights REPC") for the Pleasant Heights Property for $1,146,000.  (Exhibit A ¶ 48; Exhibit B ¶ 60).

40.    Holt and Keystone/Aalders agreed Holt would purchase the Pleasant Heights Property with some level of disputed participation by Keystone/Aalders.  (Exhibit A ¶¶ 49-56; Exhibit B ¶¶ 61-68).

41.    In April 2015, Tree Haven Homes, LLC ("Tree Haven") signed a participation agreement with Holt relative to the Pleasant Heights Property ("Tree Haven Participation Agreement"), which provided Tree Haven options to purchase four buildable lots in the Pleasant Heights Property.   (Exhibit A ¶¶ 51-56; Exhibit B ¶¶ 61-68; Tree Haven Participation Agreement at 1.  A true and correct copy of the Tree Haven Participation Agreement is attached as Exhibit J.).

---

[4] Keystone and Holt are 50/50 members/owners in Blackstone Group.  (Exhibit A ¶ 36).

42.     In September 2015, Blackstone Townhomes purchased the Highland Property with a loan of $2.6 million from Rafati Holdings. (Exhibit I at 2).

43.     On September 1, 2015, Aalders executed a management agreement with Holt and Handcrafted Homes, LLC ("Handcrafted")[5] ("Management Agreement"), under which Aalders would manage the overall real estate development activities of Holt, be compensated via forty percent of Holt's and Handcrafted's profits, and be entitled to purchase up to forty percent of any membership interest of Holt and Handcrafted. (Exhibit A ¶¶ 87-92; Exhibit B ¶¶ 95-100).

44.     In April 2016, Big D signed an assumption and assignment agreement with Tree Haven ("Assumption and Assignment Agreement"), under which Big D purchased all of Tree Haven's interest in the Tree Haven Participation Agreement. (Exhibit A ¶ 100; Exhibit B ¶ 107).

45.     McKay executed the Assumption and Assignment Agreement as a member of Big D. (Exhibit A ¶ 101; Exhibit B ¶ 108).

46.     On August 31, 2016, Keystone recorded an Amended Notice of Claim of Interest in the Utah County Recorder's Office, which stated (a) "Keystone previously assigned its beneficial interest in the [Highland] Property pursuant to the [Highland] REPC to Blackstone" and (b) as consideration, Blackstone Townhomes agreed Keystone would be involved in and share in future proceeds from the development of the Highland Property. (Exhibit I at 2-3).

47.     In September 2016, Blackstone Townhomes defaulted on its $2.6 million loan from Rafati Holdings for the Highland Property, which resulted in Rafati Holdings receiving a deed in lieu of foreclosure, and a special warranty deed was recorded. (Exhibit I at 3).

---

[5] The Robinsons formed Handcrafted, of which Aalders was a manager, in 2014. (Exhibit A ¶¶ 32-33).

4826-8619-5561.6

48.     Rafati Holdings provided Keystone written notice the Notice of Claim of Interest and the Amended Notice of Claim of Interest previously recorded by Keystone/Aalders were wrongful liens, and requested the liens be canceled and released, but Keystone refused. (Exhibit I at 3).

49.     Three core suits regarding these properties were eventually filed in the District Court of Utah, Fourth Judicial District, Utah County, American Fork Department: the *Rafati* Suit, No. 16010025; the *Holt* Suit, No. 170400043; and the *Aalders* Suit, No. 170400203.

### B. The *Rafati* Suit

50.     On November 29, 2016, Rafati Holdings filed its complaint in the *Rafati* Suit against Keystone based on Keystone's recording of a Notice of Claim of Interest and Amended Notice of Claim of Interest against the Highland Property.  (Exhibit I at 2-3).

51.     Upon information and belief, the *Rafati* Suit was focused on resolution of the property interests in the Highland Property subsequent to a purchase money loan default.

52.     On June 29, 2017, Aalders and Keystone, as third party complainants, filed their amended third party complaint in the *Rafati* Suit with respect to the Highland Property. (Exhibit C at 10).

53.     In two further iterations in the *Rafati* Suit, the Second Amended Third Party Complaint filed on September 7, 2017 and the Third Amended Third Party Complaint filed on February 8, 2018, Claimants added numerous additional third party defendants, including the McKay Defendants.  (Exhibit A; Exhibit B; Exhibit C at 11).

54.     The allegations in the *Rafati* Suit complaints implicate all dealings and transactions among these multiple parties with respect to both property developments. (*See* Exhibit A; Exhibit B).

55.    On or about July 11, 2017 the claims between the original parties to the *Rafati* Suit, Rafati Holdings and Keystone, were resolved.  (Exhibit C ¶ 31 and at 10).

### 1. Second Amended Third Party Complaint

56.    The Second Amended Third Party Complaint added numerous additional third party defendants to the *Rafati* Suit, including the McKay Defendants, and alleged the following causes of action against the McKay Defendants and others: Breach of Contract; Accounting and Winding Up; Fraudulent Transfer; Constructive Trust/Receiver; Injunction; Fraud; Interference with Economic Relations; Conspiracy; Breach of Fiduciary Duty; Intentional Infliction of Emotional Distress; and Unjust Enrichment.  (Exhibit B).

57.    Specifically with respect to the McKay Defendants, the Second Amended Third Party Complaint alleges McKay was a participant in some of the property development activities as a member of Big D, which was also named as a third party defendant.  (Exhibit B ¶ 108).

58.    Big D allegedly purchased participation rights in Pleasant Heights Property from Tree Haven, under which it had options to purchase four lots.  (Exhibit B ¶¶ 63-67, 107-114; Exhibit J at 1).

59.    The Second Amended Third Party Complaint further contends McKay, or the McKay Defendants, also represented Holt, a development company owned by the Robinsons and a third party defendant in the *Rafati* Suit, and came to represent numerous other persons and entities in the related *Holt* and *Alders* Suits, and this representation generated an unresolved conflict of interest between the McKay Defendants and various entities they represented. (Exhibit B ¶¶ 171-181, 191-193).

13

60.    The Second Amended Third Party Complaint alleges McKay is "an affiliate, co-conspirator and alter ego of every other Entity and individual defendant named herein." (Exhibit B ¶¶ 196, 198).

61.    The first cause of action in the Second Amended Third Party Complaint, "Breach of Contract", alleges McKay as the "principal and alter ego" of Big D, "breached the September 1, 2015 Management Agreement and April 9, 2015 Participation Agreement" by: (a) "becoming the real parties in interest thereto as Tree Haven's successor in interest relative to [the] Pleasant Heights [Property]"; (b) "initiating the [*Holt* Suit] to extinguish [Claimants'] rights to the April 9, 2015 Anticipation Agreement"; (c) "seeking to extinguish the September 1, 2015 Management Agreement through Holt's counterclaim in the [*Aalders* Suit]"; and (d) "using [McKay's] conflicted and pre-emptive legal conclusions . . . to retroactively justify [McKay's] own anticipatory breaches and those of [McKay's] many clients" in the various underlying suits.  (Exhibit B ¶ 216).

62.    The Second Amended Third Party Complaint further alleges McKay acted, despite these conflicts, "with an eye towards becoming the legal owner of the Pleasant Heights [Property]." (Exhibit B ¶¶ 196(e), 216(e)).

63.    The ninth cause of action in the Second Amended Third Party Complaint, "Breach of Fiduciary Duty", alleges the McKay Defendants breached a duty of loyalty to Holt and Handcrafted, and their members, including Claimants: "As the lawyers for both Holt and Handcrafted . . . [the McKay Defendants] owe fiduciary duties to Holt and Handcrafted and all its members—including [Claimants]", were "at all times aware that their perceived best interests conflicted with those of [Claimants]", and "breached their duties of undivided loyalty to Claimants".  (Exhibit B ¶¶ 291-296).

64.     The Second Amended Third Party Complaint further alleges the McKay Defendants "planned and conspired to breach their fiduciary duties to [Claimants], and then on multiple occasions did breach those fiduciary duties[.]"  (Exhibit B ¶ 297).

## 2. Third Amended Third Party Complaint

65.     In the Third Amended Third Party Complaint filed on February 9, 2018, the McKay Defendants remained as third party defendants.  (Exhibit A).

66.     With respect to the McKay Defendants, the Third Amended Third Party Complaint retained the allegations of the Second Amended Third Party Complaint and added allegations (a) the McKay Defendants violated Utah Rules of Professional Conduct 1.7 and 1.8 by failing to disclose and remediate conflicts of interest, and (b) the McKay Defendants, individually and collectively, are the alter egos of each other and Big D, as well as some or all of their alleged clients involved in the various transactions and litigation.  (Exhibit A ¶¶ 181-197).

67.     Specifically, the Third Amended Third Party Complaint alleges the McKay Defendants "failed to advise Holt or the Robinsons to have independent legal counsel review" documents prepared on Holt's behalf and violated Utah Rule of Professional Conduct 1.7(a)(1) by:

> a) failing to advise the Robinsons that [the McKay Defendants'] representation of Holt would be directly adverse to Holt;
>
> b) failing to advise them that [the McKay Defendants'] representation of Holt would be adverse to them;
>
> c) failing to advise Aalders after he became a member of Holt and Handcrafted how [the McKay Defendants'] representation of the Robinsons, Holt, Handcrafted, and the other entity defendants named herein had been adverse to [Claimants] and how it could be remedied;

d) scuttling [Claimants'] efforts to exercise their rights to conduct ordinary discovery into [d]efendants' (including [the McKay Defendants']) tortious acts and omissions described herein; [ ]

e) generally taking positions in litigation adverse to [Claimants]; and

[f]) not withdrawing as counsel to all parties.

(Exhibit A ¶ 187).

68.     The Third Amended Third Party Complaint alleges the McKay Defendants

violated Utah Rule of Professional Conduct 1.7(a)(2) by:

a) failing to advise the Robinsons of the significant risks that [the McKay Defendants'] representation of Holt would pose to Holt – especially in litigation matters and especially in those that [the McKay Defendants] initiated for Holt and especially those in which [the McKay Defendants'] alter ego entity was also a real party in interest;

b) failing to advise the Robinsons how [the McKay Defendants'] conflicts materially limited [the McKay Defendants'] responsibilities to them and Holt;

c) failing to advise Aalders of the same after [Aalders] became a member of Holt and Handcrafted;

d) scuttling [Claimants'] efforts to exercise their rights to conduct ordinary discovery into [d]efendants' (including [the McKay Defendants']) tortious acts and omissions described herein;

e) taking positions in litigation adverse to [Claimants]; and

f) not withdrawing as counsel to all parties.

(Exhibit A ¶ 188).

69.     The Third Amended Third Party Complaint further alleges the McKay Defendants

violated Utah Rule of Professional Conduct 1.8(a) and (b) by:

a) entering into a business transaction with Holt and knowingly acquiring an ownership interest therein adverse [to] Holt and its members (including Aalders) under terms that were not fair or reasonable (*supra*);

b) not advising in writing Holt, its manager and/or its members of the desirability of seeking the advice of independent legal counsel as to i) the 'Draft Agreement for Option to Purchase Real Property from Holt Development' prepared by one

Ryan Hughes 'between Big D and Holt for the property in Pleasant Grove' referenced above; or ii) any other documents that [the McKay Defendants] prepared and/or filed and/or recorded on Holt's behalf;

c) soliciting Holt and the Robinsons as clients after purchasing Tree Haven's interest in the April 9, 2015 Participation Agreement;

d) knowingly inserting themselves as litigation counsel to Holt in proceedings in which their alter ego entity was a real party interest;

e) initiating some of those proceedings (*supra*);

f) generally using information relating to [the McKay Defendants'] representation of Holt and the Robinsons to the disadvantage of Holt, the Robinsons and [Claimants]; and

g) not withdrawing as Holt's litigation counsel even as [the McKay Defendants] prepare to sue Holt for many of the same causes of action that [Claimants] assert against Holt.

(Exhibit A ¶ 189).

70.    The McKay Defendants are the subjects, among others, of the third cause of action in the Third Amended Third Party Complaint for "Fraudulent Transfer", which alleges McKay, as a member of Big D, "did not acquire and/or convey title to real property through a 'regularly conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition of the interest of the debtor upon default under a mortgage, deed of trust, or security agreement.'" (Exhibit A ¶ 244).

71.    In the fraudulent transfer cause of action, Claimants further allege every transfer of the Highland Property or Pleasant Heights Property by McKay and other defendants "was fraudulent as to [Claimants] because the named defendants made those Transfers with actual intent to hinder, delay and defraud [Claimants][.]" (Exhibit A ¶ 245).

72.    The McKay Defendants are also named in the fifth cause of action of the Third Amended Third Party Complaint, "Interference with Economic Relations", in which Claimants allege the McKay Defendants interfered with Claimants' economic relations by:

a) contacting Holt and the Robinsons in July 2016 to solicit them as legal clients as the real parties in interest to litigation proceedings that they intended to initiate and in which they never disclosed that Big [D] was actually a real party in interest;

b) not advising Holt or the Robinsons in writing and/or not securing their written waiver concerning the multiple conflicts of interest that [the McKay Defendants] representing Holt *and* the Robinsons in litigation would present;

c) otherwise using their superior knowledge as fiduciaries and lawyers to exploit Big D's interest against Holt, the Robinsons and [Claimants], including without limitation entering into the agreement with Holt . . . concerning [the] Pleasant Heights Property;

* * *

e) initiating legal proceedings to extinguish through Holt [Claimants'] rights to real property in which Big D and [McKay] also assert an interest;

f) using litigation against [Claimants] i) as a predicate to conceal and withhold information of Holt and Handcrafted to which Aalders is entitled as a member; ii) as a *post hoc* predicate to justify their breaches of the agreements described herein; iii) as shield and sword in receiving and transferring property in which [Claimants] have an interest without advising them or the courts; and iv) to glean information about [Claimants] that [the McKay Defendants] and Big D can exploit against [Claimants;]

g) further using litigation as a forum to foment delay while [the McKay Defendants] further deal in property that Holt transferred to them and in which Aalders has a 40% interest;

h) now using at least the threat of litigation against Holt and the Robinsons to secure from them the same records and much of the same relief that [Claimants] have been demanding;

* * *

j) not withdrawing as Holt's litigation counsel despite [the McKay Defendants'] plan to sue Holt and thereby assert more claims to its property and assets that compete with [Claimants'] claims to the same property and assets – and in fact

filing dispositive motions to dismiss the same claims that [Claimants] make against Holt, thereby leaving Big D free to pursued [sic] them[.]

(Exhibit A ¶ 261).

73.     The seventh cause of action in the Third Amended Third Party Complaint, "Breach of Fiduciary Duties", alleges, "[a]s the lawyers for Holt, [the McKay Defendants] owe fiduciary duties to Holt and Handcrafted and all its members-including [Claimants]. . . . [E]ven though they are adverse to [Claimants] in litigation", the McKay Defendants "planned and conspired to breach their fiduciary duties" and "on multiple occasions did breach those fiduciary duties". (Exhibit A ¶¶ 274-285).

74.     On March 13, 2018, the McKay Defendants filed their Am. Mot. to Dismiss the Third Amended Third Party Complaint, which was stricken by the court on April 18, 2018 due to its length. (Exhibit D).

### C.  Related Suits

### 1.  The *Holt* Suit

75.     On January 12, 2017, Holt filed a Petition to Nullify the Notice of Claim of Interest that Keystone had recorded against the lots comprising the Pleasant Heights Property. (Exhibit A ¶ 159; Exhibit C at 9).

76.     The McKay Defendants allegedly filed this petition on behalf of Holt.  (Exhibit C at 9).

77.     In the Third Amended Third Party Complaint, Claimants allege McKay argued on behalf of Holt but did not disclose the following:

    a)  . . . Tree Haven was no longer the real party in interest to the same Participation Agreement that was squarely at issue;

    b)  . . . Tree Haven had nearly a year earlier sold its interest to Big D for $181,333;

    c)  . . . [McKay] signed the Assumption and Assignment Agreement as Big D's sole member; and/or

    d)  . . . Big D was/is thus the real party in interest to the rights under the same Participation Agreement[.]

(Exhibit A ¶ 160).

78.    Upon information and belief, (a) the court granted Holt's petition on February 21, 2017, (b) the *Holt* Suit terminated on June 6, 2017 with an award to Holt of costs ($608.84), attorney fees ($12,980.00), and statutory damages ($3,000.00), and (c) the court memorialized its findings by judgment dated June 21, 2017.  (Exhibit C at 9).

## 2. The *Aalders* Suit

79.    On February 10, 2017, Claimants filed a complaint and Notice of Lis Pendens against Holt in the *Aalders* Suit and alleged: (a) breach of contract as to the Participation Agreement; (b) anticipatory breach of the Participation Agreement; and (c) unjust enrichment. (Exhibit C at 9).

80.    Holt answered and asserted counterclaims. (Exhibit C at 10).

81.    Upon information and belief, on March 10, 2017, the court granted Holt's Motion to Release Lis Pendens and request for related reasonable attorney's fees.  (Exhibit C at 9).

## III. The Policies

## A. 2017 Policy

82.    ALPS issued the 2017 Policy to the McKay Firm for the policy period April 1, 2017 to April 1, 2018.  (Exhibit E).

83.    McKay is listed as an insured attorney under the 2017 Policy.  (Exhibit E, Declarations Item 2).

84.     The 2017 Policy provides legal professional liability insurance on a claims made and reported basis.  (Exhibit E, Insuring Agreements § 1.1).

85.     The 2017 Policy's insuring agreement states, in relevant part:

Subject to the Limit of Liability, exclusions, conditions and other terms of this Policy, the Company agrees to pay on behalf of the Insured all sums (in excess of the Deductible amount) that the Insured becomes legally obligated to pay as Damages, arising from or in connection with A CLAIM FIRST MADE AGAINST THE INSURED AND FIRST REPORTED TO THE COMPANY DURING THE POLICY PERIOD, provided that:

1.1.1   the Claim arises from an act, error, omission or Personal Injury that happened on or after the Loss Inclusion Date and the Retroactive Coverage Date set forth in Items 2 and 3 of the Declarations, and that the Claim arises from or is in connection with:

(a)     an act, error or omission in Professional Services that were or should have been rendered by the Insured[.]

* * *

1.1.2   at the Effective Date of this Policy, no Insured knew or reasonably should have known or foreseen that the act, error, omission or Personal Injury might be the basis of a Claim; and

1.1.3   the Claim is not otherwise covered under any other insurance policy that the Company has issued to the Named Insured.

* * *

1.2.1   . . . The Company shall not have a duty to defend or to pay such expenses as to any Claim not covered under this Policy, and shall have the right to seek reimbursement from any Insured, who shall promptly provide such reimbursement, for any amount paid by the Company in defending any such non-covered Claim, including any amount paid in defending a non-covered Claim that is asserted together with one or more covered Claims.

(Exhibit E, Insuring Agreements §§ 1.1-1.2.1) (emphasis in original).

86.     "Claim" is defined in the 2017 Policy as "a demand for money or services, including but not limited to the service of suit or institution of arbitration proceedings against the Insured."  (Exhibit E, Definitions § 2.3).

87.    "Damages" is defined in the 2017 Policy as "any monetary award by way of judgment or final arbitration, or any settlement"; the 2017 Policy specifically excludes from the definition of damages:

2.6.1    punitive, multiple, or exemplary damages, fines, sanctions, penalties or citations[;]

2.6.2    awards deemed uninsurable by law;

2.6.3    injunctive, declaratory, or other equitable relief, or costs or fees incident thereto;

2.6.4    restitution, reduction, disgorgement or set-off of any fees, costs, consideration or expenses paid to or charged by an Insured, or any other funds or property of any person or entity presently or formerly held or in any manner directly or indirectly controlled by an Insured; or

2.6.5    any injury or damage to, destruction of, loss of, or loss of use of any funds or property.

(Exhibit E, Definitions § 2.6).

88.    "Insured" is defined, in part, in the 2017 Policy as:

2.15.1  The Named Insured listed in Item 1 of the Declarations; [and]

2.15.2  An Attorney who is, at the time a Claim is first made . . . a partner, stockholder or employee of the Named Insured, and who is or was identified in Item 2 of the Declarations, provided that the requirements of the Policy concerning amendment of Item 2 have been complied with, and solely for Claims arising from such Attorney's Professional Services on behalf of the Named Insured[.]

(Exhibit E, Definitions §§ 2.15.1-2.15.2).

89.    "Professional services" are defined in the 2017 Policy as:

2.24.1  services or activities performed for others as an Attorney in an attorney-client relationship on behalf of one or more clients applying the Attorney's specialized education, knowledge, skill, labor, experience and/or training;

2.24.2  services as mediator, arbitrator, or other facilitator in a dispute resolution process;

 2.24.3 services as administrator, conservator, guardian, executor, personal representative or trustee, so long as the Insured (a) is not a beneficiary of such estate or trust, and (b) is not receiving compensation other than fees for such services paid directly from such estate or trust; or

 2.24.4 services as an Attorney in researching or certifying title to real estate, but excluding services as a title insurance agent acting on behalf of a title insurance company, unless such services are specifically included under this Policy by a separate endorsement identified in Item 7 of the Declarations.

(Exhibit E, Definitions § 2.24).

 90. The 2017 Policy does not apply to any claim "arising from or in connection with . . . [a]ny dishonest, fraudulent, criminal, malicious, or intentionally wrongful or harmful act, error or omission committed by, at the direction of, or with the consent of an Insured, or any Personal Injury arising from such conduct[.]" (Exhibit E, Exclusions § 3.1.1).

 91. The 2017 Policy does not apply to any claim "arising from or in connection with . . . [a]ny Professional Services that were rendered or should have been rendered to or in connection with any Organization (including the ownership, maintenance or care of any property in connection with any such Organization) of which, at the time such Professional Services were or should have been rendered . . . [a]n Insured served in any capacity to directly or indirectly control, operate or manage such Organization." (Exhibit E, Exclusions § 3.1.3(c)).

### B. 2018 Policy

 92. On February 13, 2018, the 2018 Application for the 2018 Policy was executed on behalf of the Named Insured, the McKay Firm.

 93. In the 2018 Application, the McKay Firm answered "No" to the following questions: (a) "Has any claim or suit been made against you or any other current or former member of this Firm or any Predecessor Firm in the last five years?" and (b) "Are you or any member of the Firm aware of or do you or any member of your firm have knowledge of any

fact, circumstance, act, error, or omission that could reasonably be expected to be the basis of a claim against any current or former Attorney in the Firm or any Predecessor Firms, regardless of the merit of such claim?"

94.    On the Individual Attorney Supplement to the 2018 Application McKay executed on March 7, 2018, he answered "No" to the following questions: (a) "Has any professional liability claim or suit been made against you within the last 5 years, regardless of whether or not indemnity was paid?"; and (b) "Are you aware of or do you have knowledge of any fact, circumstance, act, error, or omission that could reasonably be expected to be the basis of a claim against you, regardless of the merit of such claim?"

95.    McKay further represented in the 2018 Application he would not and will not "render any professional legal services to any entity in which [he] serve[s] as an owner, officer, director, employee or other fiduciary, or in which [he] will serve in any capacity to directly or indirectly control, operate or manage[.]"

96.    McKay executed the McKay Defendants' acceptance incident to the 2018 Application on March 26, 2018 and represented, "there exists no changes to the answers and information set forth in the [2018] Application the [McKay Firm] has submitted to ALPS, including all supplements and attachments thereto."

97.    ALPS accepted the 2018 Application based on the information contained therein.

98.    ALPS issued the 2018 Policy to the McKay Firm for the policy period April 1, 2018 to April 1, 2019. (Exhibit F).

99.    McKay is listed as an insured attorney under the 2018 Policy. (Exhibit F, Declarations Item 2).

100.   The 2018 Policy provides legal professional liability insurance on a claims made and reported basis.  (Exhibit F, Insuring Agreements § 1.A).

101.   The 2018 Policy provides:

This is a '*CLAIMS MADE AND REPORTED*' insurance Policy. Therefore, as a condition precedent to the Company's obligation to defend or indemnify the Insured under this Policy, the Insured must immediately report any Claim to the Company during the Policy Period or during any applicable Extended Reporting Period.  No coverage exists under this Policy for a Claim which is first made against the Insured or first reported to the Company before or after the Policy Period or any applicable Extended Reporting Period.

(Exhibit F at 1) (emphasis in original).

102.   The 2018 Policy's insuring agreement states, in relevant part:

Subject to the Limit of Liability, exclusions, conditions and other terms of this Policy, the Company agrees to pay on behalf of the Insured all sums (in excess of the Deductible amount) that the Insured becomes legally obligated to pay as Damages, arising from or in connection with A CLAIM FIRST MADE AGAINST THE INSURED AND FIRST REPORTED TO THE COMPANY DURING THE POLICY PERIOD, provided that all of the following conditions are satisfied:

1. The Claim arises from a Wrongful Act that occurred on or after the Retroactive Coverage Date set forth in Item 2 of the Declarations;

2. At the Effective Date of this Policy, no Insured knew or reasonably should have known or foreseen that the Wrongful Act might be the basis of a Claim;

3. Notice of the Claim or the Wrongful Act was not given nor required to be given to any other insurer prior to the Effective Date; and

4. The Claim is not otherwise covered under any other insurance policy that the Company has issued to the Named Insured.

(Exhibit F, Insuring Agreements §§ 1.A.1-1.A.4).

103.   The 2018 Policy's insuring agreement further provides:

. . . The Company shall not have a duty to defend or to pay such expenses as to any Claim not covered under this Policy, and shall have the right to seek reimbursement from any Insured, who shall promptly provide such reimbursement, for any amount paid by the Company in defending any such non-

covered Claim, including any amount paid in defending a non-covered Claim that is asserted together with one or more covered Claims.

(Exhibit F, Insuring Agreements § 1.B.2) (emphasis in original).

104. "Claim" is defined in the 2018 Policy as "a demand for money or services including, but not necessarily limited to, the service of suit or institution of arbitration or alternative dispute resolution proceedings against the Insured." (Exhibit F, Definitions § 2.C).

105. "Damages" is defined in the 2018 Policy as any "[m]onetary award by way of judgment or final arbitration, or any settlement;" the 2018 Policy specifically excludes from the definition of damages:

3. Punitive, multiple, or exemplary damages, fines, sanctions, penalties or citations, including, without limitation, any consequential or incidental damages, attorney's fees or costs, or pre-judgment or post-judgment interest resulting therefrom, regardless against whom the same are levied or imposed and regardless of whether the same were levied or imposed in a separate matter or proceeding;

4. Awards deemed uninsurable by law;

5. Injunctive, declaratory, or other equitable relief, or costs or fees incident thereto;

6. Restitution, reduction, disgorgement or set-off of any fees, costs, consideration or expenses paid to or charged by an Insured, or any other funds or property of any person or entity presently or formerly held or in any manner directly or indirectly controlled by an Insured; [or]

7. Injury or damage to, destruction of, loss of, or loss of use of any funds or property[.]

(Exhibit F, Definitions § 2.H).

106. "Insured" is defined in the 2018 Policy, in part, as "the Named Insured listed in Item 1 of the Declarations" and:

[S]olely for Claims arising from Professional Services performed for and on behalf of the Named Insured or a Predecessor Law Firm[,] . . . [a]n Attorney who is, at the time a Claim is first made, or who was, at the Effective Date of the

Policy, a principal, partner, shareholder, member or other owner or employee of the Named Insured, and who is or was identified in Item 3 of the Declarations[.]"

(Exhibit F, Definitions § 2.Q).

107.   "Professional Services" are defined in the 2018 Policy, in part, as "services or activities performed for and on behalf of the Named Insured or a Predecessor Law Firm and rendered solely to others as: . . . [a]n Attorney in an attorney-client relationship on behalf of one or more clients applying the Attorney's specialized education, knowledge, skill, labor, experience and/or training, including pro bono services[.]'" (Exhibit F, Definitions § 2.Y.1).

108.   "Wrongful Act" is defined in the 2018 Policy, in part, as an "actual or alleged . . . [a]ct, error or omission in Professional Services that were or should have been rendered by the Insured[.]'" (Exhibit F, Definitions § 2.BB.1).

109.   The 2018 Policy does not apply to any claim "arising from or in connection with . . . [a]ny dishonest, fraudulent, criminal, malicious, or intentionally wrongful or harmful act, error or omission committed by, at the direction of, or with the consent of an Insured, or any Personal Injury arising from such conduct[.]'" (Exhibit F, Exclusions § 3.A).

110.   The 2018 Policy does not apply to any claim "arising from or in connection with . . . [a]ny Professional Services that were rendered or should have been rendered to or in connection with any Organization (including the ownership, maintenance or care of any property in connection with any such Organization) of which, at the time such Professional Services were or should have been rendered[,] . . . [a]n Insured served in any capacity to directly or indirectly control, operate or manage such Organization." (Exhibit F, Exclusions § 3.C.3).

111.   The 2018 Policy does not apply to any claim "arising from or in connection with . . . [a]ny Wrongful Act that occurred prior to the Effective Date of this Policy, if . . .[t]here is an earlier-incepting policy of professional liability insurance that provides coverage for the

Claim, or would have provided coverage for the Claim if the Insured's obligations under that policy had been complied with, regardless of the amount, if any, of the available limits of liability of the prior policy, and regardless of whether or not the deductible provisions or limits of liability of the prior policy are different from those of this Policy[.]"   (Exhibit F, Exclusions § 3.E.2).

112.   The 2018 Policy does not apply to any claim "arising from or in connection with . . .[a]ny Wrongful Act that occurred prior to the Effective Date of this Policy, if . . . [p]rior to the Effective Date of this Policy, any Insured gave or should have given to any insurer, notice of a Claim or potential Claim arising from or in connection with the Wrongful Act, or from any Wrongful Act that is connected temporally, logically or causally, by any common fact, circumstance, situation, transaction, event, advice or decision to the Claim or potential Claim." (Exhibit F, Exclusions § 3.E.3).

## IV. Notice to ALPS and ALPS's Coverage Position

113.   By correspondence from the McKay Firm dated April 23, 2018, ALPS was first notified of the Claim, as articulated in the Suit, and subsequently provided with copies of the Second Amended Third Party Complaint, the Third Amended Third Party Complaint, and the McKay Defendants' Am. Mot. to Dismiss.

114.   By correspondence dated June 11, 2018, ALPS agreed to provide the McKay Defendants with a defense against the Suit subject to its reservation of rights under the 2018 Policy.

4826-8619-5561.6

## FIRST CAUSE OF ACTION

### (For a Declaration the 2018 Policy Does Not Afford Coverage to the McKay Defendants for the Claim)

115. ALPS incorporates and realleges paragraphs 1 through 114 as if fully set forth herein.

116. Coverage under the 2018 Policy is limited to claims first made and reported to ALPS during the policy period of April 1, 2018 to April 1, 2019. (Exhibit F, Insuring Agreements § 1.A and Declarations Item 3).

117. The Claim was first made on September 7, 2017, when Claimants filed the Second Amended Third Party Complaint in the Suit against the McKay Defendants and others, and not later than February 9, 2018, the filing date of the Third Amended Third Party Complaint.

118. The Claim was first reported to ALPS on April 23, 2018.

119. The Claim—including, but not limited to, the Suit—is outside the coverage afforded by the 2018 Policy because the Claim was first made against the McKay Defendants prior to the 2018 Policy's April 1, 2018 effective date.

120. The 2018 Policy only provides coverage for claims if "[a]t the Effective Date of this Policy, no Insured knew or reasonably should have known or foreseen that the Wrongful Act might be the basis of the Claim", "[n]otice of the Claim or the Wrongful Act was not given nor required to be given to any other insurer prior to the Effective Date", and "[t]he Claim is not otherwise covered under any other insurance policy that the Company has issued to the Named Insured." (Exhibit F, Insuring Agreements §§ 1.A.2-1.A.4).

4826-8619-5561.6

121. "Wrongful Act" is defined in the 2018 Policy, in part, as an "actual or alleged . . . [a]ct, error or omission in Professional Services that were or should have been rendered by the Insured[.]" (Exhibit F, Definitions § 2.BB.1).

122. The 2018 Policy specifically excludes coverage for:

> [A]ny claim arising from or in connection with . . .[a]ny Wrongful Act that occurred prior to the Effective Date of this Policy, if . . . [p]rior to the Effective Date of this Policy, any Insured gave or should have given to any insurer, notice of a Claim or potential Claim arising from or in connection with the Wrongful Act, or from any Wrongful Act that is connected temporally, logically or causally, by any common fact, circumstance, situation, transaction, event, advice or decision to the Claim or potential Claim.

(Exhibit F, Exclusions § 3.E.3).

123. Prior to the 2018 Policy's April 1, 2018 effective date, Claimants named the McKay Defendants as third party defendants in the Second Amended Third Party Complaint (filed September 7, 2017) and the Third Amended Third Party Complaint (filed February 9, 2018). (Exhibit A; Exhibit B).

124. On March 13, 2018, also prior to the 2018 Policy's April 1, 2018 effective date, the McKay Defendants filed a motion to dismiss the claims asserted against them in the Third Amended Third Party Complaint. (Exhibit C).

125. The McKay Defendants did not report the Claim to ALPS until April 23, 2018, after the 2018 Policy's April 1, 2018 effective date.

126. The Claim—including, but not limited to, the Suit—is outside the coverage afforded by the 2018 Policy because: (a) prior to the April 1, 2018 effective date of the 2018 Policy, the McKay Defendants knew of Claimants' allegations against them in the Second Amended Third Party Complaint and the Third Amended Third Party Complaint in the Suit; (b) prior to the 2018 Policy's April 1, 2018 effective date, the McKay Defendants knew or

reasonably should have known their acts, errors, or omissions alleged in the Suit might be the basis of a claim; (c) prior to the 2018 Policy's April 1, 2018 effective date, the McKay Defendants should have given ALPS notice of the Claim, the Suit, or the claims and potential claims against the McKay Defendants arising from the acts, errors, or omissions that form the basis of the Suit; and (d) the McKay Defendants did not provide notice of the Claim, the Suit, or the claims and potential claims against them arising from the acts, errors, or omissions that form the basis of the Suit, to any insurer, including ALPS, until April 23, 2018, after inception of the 2018 Policy.

127.   The 2018 Policy does not afford coverage for the Claim—including, but not limited to, the Suit—to the extent the relief sought in the Suit does not constitute "Damages" as defined in the 2018 Policy.  (Exhibit F, Insuring Agreements § 1.A and Definitions § 2.H).

128.   The 2018 Policy specifically excludes from the definition of damages (a) "[p]unitive, multiple or exemplary damages, . . . any consequential or incidental damages, attorney's fees or costs, or pre-judgment or post-judgment interest", (b) "[i]njunctive, declaratory, or other equitable relief, or costs or fees incident thereto", and (c) "[r]estitution, reduction, disgorgement or set-off of any fees, costs, consideration or expenses paid to or charged by an Insured[.]"  (Exhibit F, Definitions §§ 2.H.3, 2.H.5, and 2.H.6).

129.   The Suit seeks, *inter alia*, injunctive relief, disgorgement of proceeds, punitive damages, exemplary damages, attorneys' fees and costs, and pre-judgment and post-judgment interest, none of which are "Damages" within the 2018 Policy's coverage.  (Exhibit A, Prayer).

130.   The 2018 Policy does not afford coverage for the Claim—including, but not limited to, the Suit—to the extent the Claim does not arise from professional services by an

"Insured" as defined in the 2018 Policy.   (Exhibit F, Insuring Agreements § 1.A and Definitions § 2.Q).

131.   "Insured" is defined in the 2018 Policy, in part, as "the Named Insured listed in Item 1 of the Declarations" and:

> [S]olely for Claims arising from Professional Services performed for and on behalf of the Named Insured or a Predecessor Law Firm[,] . . . [a]n Attorney who is, at the time a Claim is first made, or who was, at the Effective Date of the Policy, a principal, partner, shareholder, member or other owner or employee of the Named Insured, and who is or was identified in Item 3 of the Declarations[.]

(Exhibit F, Definitions § 2.Q).

132.   The McKay Firm is the Named Insured listed in the 2018 Policy's Declarations.

133.   The Suit alleges actions by McKay on behalf of entities other than the McKay Firm.

134.   McKay is not an insured under the 2018 Policy, and the Claim—including, but not limited to, the Suit—is outside the coverage afforded by the 2018 Policy, because the Claim arises from and the Suit alleges professional services by McKay on behalf of entities other than the McKay Firm.  (Exhibit A ¶¶ 101-104, 140-141, 172, 173-177, 181-189; Exhibit B ¶¶ 109-114, 189-191, 196-201).

135.   The 2018 Policy excludes coverage for any claim "arising from or in connection with . . . [a]ny dishonest, fraudulent, criminal, malicious, or intentionally wrongful or harmful act, error or omission committed by, at the direction of, or with the consent of any Insured, or any personal injury arising from such conduct[.]"  (Exhibit F, Exclusions § 3.A).

136.   The Suit alleges fraudulent, dishonest, and intentionally wrongful conduct by the McKay Defendants.  (Exhibit A ¶¶ 244-245, 261).

137.   The Claim—including, but not limited to, the Suit—is outside the coverage afforded by the 2018 Policy because it arises from or in connection with and the Suit alleges dishonest, fraudulent, criminal, malicious, or intentionally wrongful or harmful acts, errors, or omissions committed by the McKay Defendants.  (Exhibit A ¶¶ 188, 189, 244, 245, 261).

138.   The 2018 Policy excludes coverage for any claim "arising from or in connection with . . . [a]ny Professional Services that were rendered or should have been rendered to or in connection with any Organization (including the ownership, maintenance or care of any property in connection with any such Organization) of which, at the time such Professional Services were or should have been rendered . . . [a]n Insured served in any capacity to directly or indirectly control, operate or manage such Organization."  (Exhibit F, Exclusions § 3.C.3).

139.   The Suit alleges actions by McKay related to professional services rendered in connection with organizations other than the McKay Firm and controlled by McKay, specifically Big D.  (Exhibit A ¶¶ 101-104).

140.   The Claim—including, but not limited to, the Suit—is outside the coverage afforded by the 2018 Policy because it arises from or in connection with and the Suit alleges professional services the McKay Defendants rendered in connection with organizations other than the McKay Firm and controlled by McKay.

141.   The 2018 Policy excludes coverage for any claim "arising from or in connection with . . . [a]ny Wrongful Act that occurred prior to the Effective Date of this Policy, if . . .[t]here is an earlier-incepting policy of professional liability insurance that provides coverage for the Claim, or would have provided coverage for the Claim if the Insured's obligations under that policy had been complied with, regardless of the amount, if any, of the available limits of liability of the prior policy, and regardless of whether or not the deductible provisions or limits

33

of liability of the prior policy are different from those of this Policy[.]"    (Exhibit F, Exclusions § 3.E.2).

142.   The Claim arises from or in connection with acts by the McKay Defendants prior to the 2018 Policy's effective date, April 1, 2018, and was not reported under an earlier-incepting policy of professional liability insurance, which may have afforded coverage had the McKay Defendants complied with their obligations under such policy.

143.   The Claim—including, but not limited to, the Suit—is outside the coverage afforded by the 2018 Policy because the Claim arises from or in connection with acts prior to the effective date of the 2018 Policy, and there was an earlier-incepting policy of professional liability insurance which may have afforded coverage had the McKay Defendants complied with such policy's obligations.

144.   An actual controversy exists between ALPS and the McKay Defendants regarding whether the 2018 Policy affords coverage for the Claim.

145.   Because the Claim—including, but not limited to, the Suit—is outside the coverage afforded by the 2018 Policy, ALPS is entitled to a declaratory judgment in its favor, pursuant to 28 U.S.C. § 2201, declaring the 2018 Policy does not afford coverage to the McKay Defendants for the Claim and ALPS has no duty to defend or indemnify the McKay Defendants under the 2018 Policy with respect to the Claim.

## SECOND CAUSE OF ACTION

### (For a Declaration the 2017 Policy Does Not Afford Coverage to the McKay Defendants for the Claim)

146.   ALPS incorporates and realleges paragraphs 1 through 145 as if fully set forth herein.

147.   Coverage under the 2017 Policy is limited to claims first made and reported to ALPS during the policy period of April 1, 2017 to April 1, 2018.   (Exhibit E, Insuring Agreements § 1.A and Declarations Item 3).

148.   The Claim was first made on September 7, 2017, when Claimants filed the Second Amended Third Party Complaint in the Suit against the McKay Defendants and others, and not later than February 9, 2018, the filing date of the Third Amended Third Party Complaint.

149.   The Claim was first reported to ALPS on April 23, 2018.

150.   The Claim—including, but not limited to, the Suit—is outside the coverage afforded by the 2017 Policy because the Claim was not reported to ALPS during the 2017 Policy's April 1, 2017 to April 1, 2018 policy period; the McKay Defendants did not report the Claim to ALPS until April 23, 2018, after expiration of the 2017 Policy.

151.   An actual controversy exists between ALPS and the McKay Defendants regarding whether the 2017 Policy affords coverage for the Claim.

152.   Because the Claim—including, but not limited to, the Suit—is outside the coverage afforded by the 2017 Policy, ALPS is entitled to a declaratory judgment in its favor, pursuant to 28 U.S.C. § 2201, declaring the 2017 Policy does not afford coverage to the McKay Defendants for the Claim and ALPS has no duty to defend or indemnify the McKay Defendants under the 2017 Policy with respect to the Claim.

## THIRD CAUSE OF ACTION

### (Reimbursement of Defense Expenses)

153.   ALPS incorporates and realleges paragraphs 1 through 152 as if fully set forth herein.

4826-8619-5561.6

154.   The 2018 Policy states ALPS has no duty to defend or pay defense expenses for "any Claim not covered" and "has the right to seek reimbursement from any Insured, who shall promptly provide such reimbursement, for any amount paid by the Company in defending any such non-covered Claim that is asserted together with one or more covered Claims." (Exhibit F, Insuring Agreements § 1.B.2).

155.   ALPS is providing the McKay Defendants a defense against the Suit under the 2018 Policy subject to a complete reservation of ALPS's rights, including the right to seek recovery from McKay Defendants or any insured under the 2018 Policy, of all amounts paid in defense of any non-covered claim or any non-covered aspects of the Claim.

156.   For the described above in Paragraphs 115 through 145, the Claim—including, but not limited to, the Suit—is outside the coverage afforded by the 2018 Policy.

157.   ALPS is entitled to judgment in its favor for the amount of attorneys' fees and costs paid to defend the McKay Defendants against the Suit because the Suit is not covered under the 2018 Policy.

WHEREFORE, ALPS prays that judgment be entered in its favor and against Defendants as follows:

1.      Declaring the 2018 Policy does not afford coverage to the McKay Defendants for the Claim—including, but not limited to, the Suit—and ALPS has no duty to defend or indemnify the McKay Defendants under the 2018 Policy with respect to the Claim;

2.      Declaring the 2017 Policy does not afford coverage to the McKay Defendants for the Claim—including, but not limited to, the Suit—and ALPS has no duty to defend or indemnify the McKay Defendants under the 2017 Policy with respect to the Claim;

3.    Awarding damages in the amount of attorneys' fees and costs paid to defend the McKay Defendants against the Suit; and

4.    Awarding ALPS such additional relief as shall be deemed appropriate in the circumstances, together with its costs and expenses.

**DATED** this __27__<sup>th</sup> day of August, 2018.

KIPP AND CHRISTIAN, P.C.

GREGORY J. SANDERS
*Counsel for Plaintiff ALPS Property & Casualty Insurance Company*
